# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN PINA, | ) | No. ED CV 17-1129-PLA |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| NANCY BERRYHILL, DEPUTY | ) | |
| COMMISSIONER OF OPERATIONS, | ) | |
| | ) | |
| Defendant. | ) | |

## I.

## PROCEEDINGS

Plaintiff filed this action on June 8, 2017, seeking review of the Commissioner's[1] denial of her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments. The parties filed Consents to proceed before a Magistrate Judge on June 27, 2017,

---

[1]    On March 6, 2018, the Government Accountability Office stated that as of November 17, 2017, Nancy Berryhill's status as Acting Commissioner violated the Federal Vacancies Reform Act (5 U.S.C. § 3346(a)(1)), which limits the time a position can be filled by an acting official. As of that date, therefore, she was not authorized to continue serving using the title of Acting Commissioner. As of November 17, 2017, Berryhill has been leading the agency from her position of record, Deputy Commissioner of Operations.

and July 13, 2017.  Pursuant to the Court's Order, the parties filed a "corrected" Joint Submission (alternatively "JS") on March 27, 2018, that addresses their positions concerning the disputed issues in the case.  [ECF No. 24.]  The Court has taken the Joint Submission under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born on March 4, 1972.  [Administrative Record ("AR") at 19, 117, 123.]  She has past relevant work experience as a child care worker, warehouse worker, and automobile salesperson.  [AR at 330, 371.]

On June 7, 2010, plaintiff filed an application for a period of disability and DIB, and an application for SSI payments, alleging that she has been unable to work since July 19, 2009.  [AR at 9, 117, 123.]  After her applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR at 69-70.]  A hearing was held on May 22, 2012, at which time plaintiff appeared represented by an attorney, and testified on her own behalf.  [AR at 26-47.]  A vocational expert ("VE") also testified.  [AR at 44-45.]  On June 7, 2012, the ALJ issued a decision concluding that plaintiff was not under a disability from July 19, 2009, the alleged onset date, through June 7, 2012, the date of the decision.  [AR at 9-21.]  Plaintiff requested review of the ALJ's decision by the Appeals Council, which the Appeals Council denied on August 7, 2013.  [AR at 1-3.]  Plaintiff then filed an action with this Court in case number ED CV 13-1806-PLA and, on July 28, 2014, this Court remanded the matter.  [AR at 380-99; see also id. at 377-79 (Appeals Council Remand Order).]  On July 22, 2015, a remand hearing was held before a different ALJ, at which time plaintiff again appeared represented by an attorney and testified on her own behalf.  [AR at 345-76.]  A different VE also testified.  [AR at 368-74.]  On September 24, 2015, the ALJ issued a decision concluding that from July 19, 2009, through July 31, 2010, plaintiff was disabled, but that medical improvement occurred beginning August 1, 2010.  [AR at 322-39.]  Plaintiff filed exceptions to the decision with the Appeals Council [AR at 293-96], which were denied on April 5, 2017, with a statement that the

ALJ's September 24, 2015, decision was the final decision of the Commissioner after remand from the Court. [AR at 290-91.] This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (citation omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Id. (internal quotation marks and citation omitted). However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)). The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at

1  least twelve months.  <u>Garcia v. Comm'r of Soc. Sec.</u>, 768 F.3d 925, 930 (9th Cir. 2014) (quoting

2  42 U.S.C. § 423(d)(1)(A)).

3

4  **A.    THE FIVE-STEP EVALUATION PROCESS**

5      The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

6  whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; <u>Lounsburry v. Barnhart</u>, 468

7  F.3d 1111, 1114 (9th Cir. 2006) (citing <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).

8  In the first step, the Commissioner must determine whether the claimant is currently engaged in

9  substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  <u>Lounsburry</u>,

10  468 F.3d at 1114.  If the claimant is not currently engaged in substantial gainful activity, the

11  second step requires the Commissioner to determine whether the claimant has a "severe"

12  impairment or combination of impairments significantly limiting her ability to do basic work

13  activities; if not, a finding of nondisability is made and the claim is denied.  <u>Id.</u>  If the claimant has

14  a "severe" impairment or combination of impairments, the third step requires the Commissioner

15  to determine whether the impairment or combination of impairments meets or equals an

16  impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P,

17  appendix 1; if so, disability is conclusively presumed and benefits are awarded.  <u>Id.</u>  If the

18  claimant's impairment or combination of impairments does not meet or equal an impairment in the

19  Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient

20  "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the

21  claim is denied.  <u>Id.</u>  The claimant has the burden of proving that she is unable to perform past

22  relevant work.  <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).  If the claimant meets

23  this burden, a <u>prima</u> <u>facie</u> case of disability is established.  <u>Id.</u>  The Commissioner then bears

24  the burden of establishing that the claimant is not disabled because there is other work existing

25  in "significant numbers" in the national or regional economy the claimant can do, either (1) by

26  the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt.

27  404, subpt. P, app. 2. <u>Lounsburry</u>, 468 F.3d at 1114.  The determination of this issue comprises

28  the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; <u>Lester v.</u>

1  Chater, 81 F.3d 721, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

2

3  **B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

4        The ALJ noted that pursuant to the Court's remand order, the ALJ on remand was

5  instructed to reconsider the opinions of plaintiff's treating doctor, James Evans, M.D., explain the

6  weight afforded to each medical opinion with legally adequate reasons for any portion of the

7  opinion(s) the ALJ rejects, reevaluate the third-party function report, re-assess plaintiff's RFC, and

8  determine at step five, with the assistance of a VE, if necessary, whether plaintiff is capable of

9  performing other work existing in significant numbers in the economy.  [AR at 322.]

10        On remand, at step one, the ALJ found that plaintiff had not engaged in substantial gainful

11  activity since July 19, 2009, the alleged onset date.[2]  [AR at 326.]  At step two, the ALJ concluded

12  that from July 19, 2009, through July 31, 2010, plaintiff was disabled with the following severe

13  impairments: multilevel degenerative disc disease of the lumbar spine without spinal cord

14  compromise; mild bilateral neural foraminal narrowing at L5-S1; small posterior disc margin

15  annular tear at L4-L5; and obesity.  [Id.]  The ALJ also found that plaintiff's medically determinable

16  mental impairments of depressive disorder and anxiety disorder did not limit her ability to perform

17  basic mental work activities and were nonsevere from July 19, 2009, through July 31, 2010.  [Id.]

18  At step three, the ALJ determined that from July 19, 2009, through July 31, 2010, plaintiff did not

19  have an impairment or a combination of impairments that met or medically equaled any of the

20  impairments in the Listing.  [AR at 327.]  The ALJ further found that plaintiff retained the residual

21  functional capacity ("RFC")[3] to perform less than the full range of sedentary work as defined in 20

22

23  _____

24        [2]    The ALJ concluded that plaintiff met the insured status requirements of the Social
     Security Act through December 31, 2014.  [AR at 326.]
25

26        [3]    RFC is what a claimant can still do despite existing exertional and nonexertional
     limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps
27  three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which
     the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149,
28  1151 n.2 (9th Cir. 2007) (citation omitted).

C.F.R. §§ 404.1567(a), 416.967(a),[4] as follows:

> [She] could lift or carry a maximum of five pounds; [she] could not push or pull; [she] could stand a maximum of one hour at a time; [she] would require a cane for ambulation; and [she] could perform postural activities on a less than occasional basis.

[AR at 328.] At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that from July 19, 2009, through July 31, 2010, plaintiff was unable to perform any of her past relevant work as a child care worker, warehouse worker, or automobile salesperson. [AR at 330.] At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that there were no are jobs existing in significant numbers in the national economy that plaintiff could have performed. [AR at 331.] Accordingly, the ALJ determined that plaintiff was under a disability from July 19, 2009, through July 31, 2010. [Id.]

The ALJ also determined that beginning August 1, 2010, the date he found that plaintiff's disability ended, plaintiff had the severe impairments of multilevel degenerative disc disease of the lumbar spine without spinal canal compromise; lumbar strain; lumbar radiculitis; obesity; depressive disorder; and anxiety disorder. [AR at 331-32.] The ALJ also found that beginning August 1, 2010, plaintiff did not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing and that although she still had back problems, "her treatments became generally routine in nature with somewhat normal examination findings and no objective clinical findings supporting her allegations of disabling symptoms." [AR at 332.] The ALJ further found that the medical improvement that occurred as of August 1, 2010, is related to plaintiff's ability to work "because there has been an increase in [her] residual functional capacity" and she can perform less than the full range of light[5] work, as follows:

---

[4]    "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a), 416.967(a).

[5]    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying
(continued...)

[She] can lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently; [she] can stand and/or walk six hours out of an eight-hour workday; [she] can sit six hours out of an eight-hour workday; [she] can perform postural activities, such as climbing, balancing, stooping, kneeling, crouching, and crawling, on an occasional basis, but [she] cannot squat or climb ladders, ropes, or scaffolds; [she] must avoid excessive vibration; [she] must avoid hazardous machinery and unprotected heights; [she] would need a can[e] if outside of the immediate work area; and [she] is limited to simple and routine work due to depression and anxiety.

[AR at 332-33.] At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that beginning August 1, 2010, plaintiff was still unable to perform any of her past relevant work. [AR at 337.] At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that there were jobs existing in significant numbers in the national economy that plaintiff can perform, including work as an "information clerk" (Dictionary of Occupational Titles ("DOT") 237.367-046), "charge account clerk" (DOT No. 205.367-014), and "bench assembler, buttons and notions" (DOT No. 734.687-018). [AR at 338.] Accordingly, the ALJ determined that plaintiff's disability ended August 1, 2010. [Id.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when he: (1) found improvement after August 1, 2010; and (2) rejected plaintiff's subjective symptom testimony. [JS at 5.] As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

/

/

---

[5](...continued)
of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

## A.    LEGAL STANDARD FOR MEDICAL IMPROVEMENT

Once the Commissioner (or ALJ) finds a claimant to be disabled, a presumption of continuing disability arises.  Murray v. Heckler, 722 F.2d 499, 500 (9th Cir. 1983) (citation omitted).  To revoke benefits, "the Commissioner bears the burden of establishing that a claimant has experienced medical improvement that would allow him to engage in substantial gainful activity."  McCalmon v. Astrue, 319 F. App'x 658, 659 (9th Cir. 2009) (citing Murray, 722 F.2d at 500).  The Commissioner must follow an eight-step sequential evaluation process in determining whether the claimant's impairments have sufficiently improved to warrant a cessation of Disability Insurance Benefits.  See 20 C.F.R. § 404.1594(f).  The eight steps are as follows:  (1) if the claimant is currently engaged in substantial gainful activity ("SGA"), disability has ended; (2) if not, and the claimant has an impairment or combination of impairments that meets or equals a listing, disability continues; (3) if the claimant does not meet or equal a listing, the ALJ will determine whether medical improvement has occurred; (4) if so, the ALJ will determine whether the improvement is related to the claimant's ability to work (i.e., to an increase in the claimant's RFC); (5) if no medical improvement -- or no improvement related to ability to work -- has occurred, disability continues, unless certain exceptions apply[6]; (6) if there has been medical improvement related to the claimant's ability to work, the ALJ will determine whether all the current impairments, in combination, are "severe"; if not, disability ends; (7) if the claimant meets the "severity" criteria, the ALJ will determine the current RFC, and, if the claimant is able to do past work, disability ends; (8) if the claimant remains unable to do past work, the ALJ will determine whether the claimant can do other work, given his RFC, age, education and past work experience.  If so, disability ends.  If not, disability continues.  20 C.F.R. § 404.1594(f).

/

/

---

[6]    The exceptions include advances in medical technology or vocational therapy related to the claimant's ability to work; new or improved diagnostic techniques or a prior evaluation error indicating that the impairment is not as disabling as once thought; evidence that the claimant is engaging in SGA; evidence of fraud in obtaining benefits; and evidence that the claimant failed to follow prescribed treatment.  20 C.F.R. § 404.1594(d)-(e), (f)(5).

1 **B.     THE ALJ'S FINDING OF MEDICAL IMPROVEMENT**

2         In this case, the ALJ accepted the reports of plaintiff's treating physician, Dr. Evans, who

3 completed disability forms on plaintiff's behalf for the California Employment Development

4 Department ("EDD"). [AR at 193-96.] Dr. Evans indicated that he first saw plaintiff on September

5 1, 2009. [AR at 193.] On March 10, 2010, his treatment note reflected that plaintiff experienced

6 chronic lower back pain, her lumbar spine x-ray showed scoliosis, and she is "unable to perform

7 ADLs [activities of daily living]." [Id.] He also noted that he had diagnosed her with degenerative

8 disc disease, she has "severe low back pain," her range of motion is decreased, and she requires

9 assistance with ambulation. [AR at 194.] At that time he "estimated" that she would be able to

10 perform her regular or customary work by June 1, 2010. [Id.] On March 26, 2010, Dr. Evans

11 completed an EDD "Request for Medical Information" in which he again indicated that plaintiff had

12 been diagnosed with degenerative disc disease; he also noted that her range of motion had

13 decreased, her spine was tender to palpation, she was unable to lift more than five pounds, she

14 cannot push or pull, she cannot stand for more than one hour at a time, and she had been referred

15 to neurosurgery and had an upcoming appointment scheduled for May 25, 2010. [AR at 195.] On

16 that date he "estimated" that she would be able to resume her regular or customary work by July

17 1, 2010. [Id.]

18         "Regarding the record prior to August 1, 2010," the ALJ gave "significant weight" to Dr.

19 Evans' opinion, in part because the opinions of a treating physician are considered more reliable

20 because of the duration of the treating relationship, and because his opinion regarding her

21 functional limitations was supported by the objective medical evidence and consistent with the

22 record as a whole. [AR at 330.] Regarding the record after August 1, 2010, the ALJ stated that

23 Dr. Evans "suggested [plaintiff's] limitations would only last until approximately July 2010." [AR

24 at 336.] He also noted that there is no medical source statement from a reviewing, examining, or

25 treating physician since August 1, 2010, that would support greater limitations. [Id.] The ALJ

26 further observed that there was no evidence of follow-up treatment with Dr. Evans "to support the

27 extension of the limitations adopted for the period of July 19, 2009 through July 31, 2010." [Id.]

28

Accordingly, the ALJ implicitly discounted Dr. Evans' opinion for any date after July 31, 2010. Instead, the ALJ gave "significant, but not great, weight" to the September 13, 2010, opinions of the State agency medical consultant, R. Jacobs, M.D., who reviewed the records prior to August 1, 2010, and opined that plaintiff could perform a range of light work, including lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting, standing and/or walking six hours in an eight-hour workday; never climbing ladders, ropes or scaffolds; and occasionally performing all other postural activities.  [AR at 336 (citing AR at 225-31).]  The ALJ found that Dr. Jacobs' assessment was reasonable and consistent with the objective medical evidence as of August 1, 2010, but also determined that Dr. Jacobs did not have the benefit of considering the additional evidence that was "available only after the reconsideration determination, including subsequent medical evidence and the hearing testimony." [Id.] He also noted that "the State agency medical *consultants*"[7] did not adequately consider plaintiff's subjective symptom testimony. [Id.] The ALJ, therefore, stated that his RFC determination after August 1, 2010, "with greater environmental limitations [than found by Dr. Jacobs] as well as consideration of [plaintiff's] use of a cane, takes into account the benign objective findings, but also generously considers [plaintiff's] subjective complaints." [Id.]

Plaintiff submits that although the ALJ found plaintiff to be "generally credible" regarding her symptoms and limitations from her alleged onset date through July 31, 2010 [JS at 7 (citing AR at 328)], he inexplicably also found that after July 31, 2010, she was "not credible":

> While she continued to exhibit significant symptoms after continued treatment, the record did *suggest* some improvement in her condition over time. For instance, by her June 22, 2010, neurosurgical appointment, she reported continued pain, she had a slow gait, and she had moderate range [of motion] with pain being worse on extension. Yet, her gait was steady, she had normal motor examination of bilateral lower extremities, and while she was noted to have multilevel degenerative disk disease for which she was *going to have* facet injections, it was noted that no surgical intervention was needed.

---

[7]    The ALJ did not identify any State agency medical consultant other than Dr. Jacobs; his reference to "consultants" is unclear in this context.

[Id. (citing AR at 243[8] (emphasis added) (citations omitted)).]

Plaintiff argues that a "*suggestion*" of improvement is not the standard and that *factual* evidence of functional improvement is lacking in this case. [JS at 8 (citing Attmore v. Colvin, 827 F.3d 872, 874 (9th Cir. 2016) (finding that in closed-period cases, the ALJ should compare the medical evidence used to determine the claimant was disabled with the medical evidence existing at the time of the asserted medical improvement)).] She states that the record reflects that her condition "did not functionally change but gradually worsened" and the ALJ even "added new impairments since August 1, 2010, [including] lumbar strain, lumbar radiculitis, depressive disorder and anxiety disorder," while "eliminat[ing] the 'mild bilateral neural foraminal narrowing at L5-S1 and small posterior disc margin annular tear at L4-5'" after July 31, 2010. [Id. (citations omitted).] She notes that on June 22, 2010, "the last date of treatment before the ALJ found improvement," Dr. Miulli, the neurosurgeon, found that plaintiff's pain was constant and no longer "on and off"; she used a walker for long walks and a cane when in pain; her gait was slow "due to pain" but steady; she had mild tender points worsening with extension; the motor examination of her bilateral lower extremities "was 5/5 in all motions"; her sensation was intact to light touch bilaterally; and she was scheduled to "undergo injections and, if her pain increased, possible decompression" of the L4-L5 vertebrae. [JS at 10 (citing AR at 218, 243).] Plaintiff cites to other evidence in the record reflecting that her condition had worsened, and not improved, after July 31, 2010, including, among other things, the following:

- August 25, 2010, x-rays of the lumbar spine showed straightening, possibly from muscle spasm, but no subluxation on flexion or extension [AR at 239];

- an examination in August 2010 showed diffuse paraspinal tenderness at L3-L5, tenderness over the facet joints, and pain shooting down the left side of her back and occasionally her leg, but she had negative straight leg test and negative

---

[8] This note stated that although "[a]t this time, no surgical intervention is needed . . . in the future if her symptoms worsen, there may be a possible need for decompression at the L4-L5 level in the future." [AR at 243.]

FABERE[9] signs, and she was assessed with lumbar spondylosis without myelopathy, lumbalgia, depression, hypertension, and scoliosis [AR at 240-41];

- on September 23, 2010, plaintiff underwent bilateral lumbar medial branch blocks and experienced a "brief period of respite" [AR at 234-36];

- on April 19, 2011, plaintiff continued to have back pain and another MRI was prescribed; she was noted to have a slightly higher left hip leaning to the right with posterior scoliosis in her lumbar spine on palpation [AR at 289];

- a June 23, 2011, MRI showed space narrowing and disc dessication from L2-L4, mild bilateral stenosis at L2-L3, disc osteophytes with right disc protrusion with mild right neural foraminal stenosis and mild left neural foraminal stenosis, and moderate facet hypertrophy at L3-L4, and minimal broad-based disc osteophyte complex with "severe bilateral facet hypertrophy" [AR at 285];

- a neurological examination conducted by Omid Hariri, D.O., on July 19, 2011, showed greater complaints of numbness in the left extremity and worse pain in her lower back than in her legs; plaintiff attributed 70% of her pain to her back pain and 30% to her leg pain; her FABERE signs were now positive bilaterally; and she used a cane (favoring her right side) and her gait was "mildly widened," although she could balance herself with the cane [AR at 281-82];

- an October 18, 2011, osteopathic examination conducted by Raed Sweiss, D.O., reflected that plaintiff continues to have pain, and has undergone physical therapy, occupational therapy, and facet blocks "to no avail," and is on "numerous pain medications" [AR at 276];

- on March 11, 2014, plaintiff was noted to be using more medication than prescribed "due to increased pain," requested reevaluation of her medications, and inquired about seeing a spinal surgeon for a consultation about any further treatment options

_____

[9]    Plaintiff explains that FABERE is an acronym for "flexion, abduction, external rotation, and extension of the hip." [JS at 11 n.1.]

for her; she reported fatigue, muscle pain and spasm, and anxiety; the treating provider described "abnormal findings" of decreased range of motion on all planes, tenderness to touch in the paraspinous area, and decreased range of motion on extension and flexion; she reported experiencing trouble establishing psychiatric care; and the treating provider increased plaintiff's pain medications and continued her psychiatric medications (Prozac and Xanax) [AR at 522-23];

- on May 22, 2014, she reported her pain was 8-9 on a 10-point scale, and was found to have the same "abnormal findings" as at the March 11, 2014, visit (see above) [AR at 528-29];

- "[a]lmost four years after the ALJ found improvement and after a steep decline, the first note of improvement is on June 8, 2014," when plaintiff started Topamax and reported a "significant improvement in her pain," although she remained positive for fatigue, pain, rash, and anxiety [JS at 13 (citing AR at 531-33)]; the treatment report also reflects, however, that plaintiff reported her pain as 9/10 without medication, and "7-8/10 with medication," and that she was using a cane for mobility [AR at 531];

- on July 17, 2014, plaintiff was "back to her pain baseline" of 10/10 without medication and 9-10/10 with medication, and was using a wheelchair for mobility [AR at 534-36]; and

- on March 9, 2015, plaintiff's medication was increased to include morphine, but later in March and April 2015, she still reported continued pain and her examination findings did not change [AR at 555, 560-62].

[JS at 8-14.] Plaintiff concludes that the record "does not show improvement," and that five years after the ALJ found she had improved, she was taking "higher" pain medications, her MRI showed more severe facet hypertrophy, and injections had failed. [Id.] She also notes that the January 22, 2015, consultative examination findings of Vicente R. Bernabe, D.O., to which the ALJ gave "little weight," actually were *not* inconsistent with Dr. Evans' findings. [JS at 14 (citing AR at 517-18).] Indeed, Dr. Bernabe noted examination findings that included the fact that plaintiff was using

a single-point cane to ambulate; that she could walk without the cane at a "slow deliberate pace" but was unable to heel-toe walk because of back pain, could only perform a 25% squat, and exhibited short swing and stance phases in her gait. [AR at 518.] Dr. Bernabe also noted significant tenderness to palpation at the lumbosacral junction, and positive straight leg raising with leg and back pain on the back of both legs at 40 degrees supine and 70 degrees seated.[10] [Id.] Finally, plaintiff argues that the "improvement" date suggested by Dr. Evans -- July 31, 2010 -- was the date when her "State Disability was no longer available as the time period was exceeded" [JS at 28], the September 13, 2010, opinion of the non-examining reviewing consultant, Dr. Jacobs, does not constitute substantial evidence, and, where medical changes have occurred, medical reports from an early phase are "likely to be less probative than later reports." [JS at 14-15 (citations omitted).]

Defendant asserts that the ALJ's determination of medical improvement was "legally sound and supported by substantial evidence." [Id.] However, defendant's arguments in support of the ALJ's finding of improvement are each deficient in some manner, and do not constitute substantial evidence. She states, for example, that no doctor opined that plaintiff was disabled after July 31, 2010, and Dr. Bernabe in 2015 "determined that [plaintiff] was much more functionally capable (medium work) than found by the ALJ (light work)." [JS at 17.] She also points to some of Dr. Hariri's findings in July 2011, i.e., plaintiff "was neurologically intact, with full motor strength and sensation," walked with a cane, had negative straight leg raising test, and did not show any signs of Babinski, Hoffman, or clonus. [JS at 21 (citing AR at 281-82).] Defendant did not mention, however, the ALJ's rejection of Dr. Bernabe's opinion, or Dr. Hariri's positive FABERE findings, plaintiff's"mildly widened" gait, her pain on palpation from L1 to L5, her numbness and decreased sensation in her lower extremities, the plan for facet injections at L4-L5 and L5-S1, or her diagnosis of lumbar stenosis at L5-S1 with "degenerative disk disease at L3-L4-L5 as well as facet

---

[10]   Notwithstanding his examination findings, Dr. Bernabe opined that plaintiff was capable of performing medium-level work with frequent postural and agility activities; the ALJ instead found that "the more restrictive limitations assessed by Dr. Jacobs" were more consistent with the treatment records. [AR at 336.]

hypertrophy/disease at L4-L5." [See AR at 282.]

Defendant also comments on Dr. Sweiss' findings of symmetrical movement of all extremities with full motor strength and intact sensation, but did not mention his additional findings that physical therapy, occupational therapy, and facet blocks had not helped, or that plaintiff was on "numerous pain medications." [JS at 21 (citing AR at 276-77).] Defendant admits that in March 2014 plaintiff reported an increase in pain, was noted to have tenderness to palpation and decreased range of motion, and that her pain prescription for MS Contin was increased, but otherwise implies that the fact that plaintiff was "neurologically intact" somehow counterbalanced the other findings. [JS at 22-23 (citing AR at 522-23).] There is no evidence, however, that the findings indicating that plaintiff was "neurologically intact" were in any way counter-indicated by the other objective evidence and findings of record, and defendant points to no provider who opined that being "neurologically intact" in some respects was somehow inconsistent with plaintiff's impairments, pain, and/or limitations.

Defendant also observes that between April 2014 and May 2015 plaintiff seemed to have experienced ups and downs with her pain treatment, such that by March 2015 she reported that "Norco was no longer effective and she wished to try a morphine derivative." [JS at 22 (citing AR at 528-29, 549, 555, 557-62).] Defendant recites Dr. Bernabe's findings (which, as discussed above, were consistent with Dr. Evans' findings), and seems to note with approval Dr. Bernabe's opinion -- rejected even by the ALJ in light of the record evidence -- that plaintiff was capable of medium work. [JS at 23 (citing 516-20).] Defendant also concedes that the "ALJ acknowledged that the more recent evidence did show continued complaints of pain, *but* Plaintiff received only medication management (e.g., was not a candidate for surgery)." [JS at 25 (emphasis added) (citing AR at 334, 522-606).] The fact that plaintiff was not a candidate for surgery at that time, however, has no bearing on whether plaintiff medically improved as of August 1, 2010, or on her subjective symptom testimony as to her pain and limitations. Indeed, it was noted in the record that plaintiff *might be* a candidate for surgery in the future. [See, e.g., AR at 218 ("possible decompression in future at L4-5" if symptoms increase), 241 (noting that plaintiff was "not a good

candidate for surgery *at this time*," and recommending radiofrequency ablation of the medial branch nerves), 243, 526 ("PCP to consider surgical consult").]  And, plaintiff's "medication management" (which was *not* the only treatment she received) included "numerous pain medications" including Norco, morphine, MS Contin, and other narcotic/opioid medications -- some of which she had been authorized to take above the otherwise authorized dosage pursuant to an approved "patient exception request (PER)" requested in May 2014 and authorized in July 2014. [See, e.g., AR at 528-29, 533, 534.]

Defendant argues that the ALJ also acknowledged that at monthly treatment visits from March 2014 through May 2015 plaintiff "reported symptoms that were positive for muscle pain and spasm, and she exhibited decreased range of motion with tenderness across her back," used a cane and/or a wheelchair for mobility "*but* musculoskeletal examination revealed she had a steady gait with no bony or joint abnormalities," *and*, as of October 2014 there as no mention of a wheelchair.  [JS at 25 (emphasis added) (citing AR at 334, 534-35, 543-64).]  As noted above, those same treatment notes also reflected pain at the level of 8-10 on a 10-point scale even with medication, mild distress, decreased range of motion, and tenderness to palpation.  The treatment notes also reflect *consistent* use of a cane for mobility (in addition to the one treatment note that stated plaintiff "uses a cane *and* a wheelchair for mobility"); in April 2014 plaintiff reported that she had discussed using a wheelchair with her primary care physician [AR at 526]; and, in July, August, and September 2014, plaintiff was noted to "use[] a cane for mobility" and/or "ambulate[] with a single point cane," but also was noted to be seated in a wheelchair at those visits.  [AR at 534-36, 537-39, 540-42].  Moreover, although there were treatment notes that stated plaintiff's gait was "steady," there were also notes that reflected that her gait was "widened," steady but slow and deliberate due to pain, that she was unable to toe and heel walk because of pain, and/or that she exhibited short swing and stance phases.  Common sense dictates that a "steady" gait is not in and of itself indicative of a perfectly "normal" gait or no physical limitations.

Defendant also contends that the ALJ did not point to only isolated signs of improvement, as evidenced by his "comparison of [the] 2010 and 2011 MRI imaging of Plaintiff's low back,"

which "revealed fewer problems" in 2011. [JS at 27 (citing AR at 281, 285, 334).] However, there is no evidence of record that confirms that the 2011 MRI actually revealed *fewer* problems than those revealed by the 2010 MRI. Although Dr. Hariri noted that the "suggestion" of neural foraminal narrowing at L5-S1 on plaintiff's 2010 MRI was "not appreciated on the MRI from 2011" [id. (citing AR at 281)], from the context of this statement it appears that "not appreciated" means that the previous "suggestion" of neural foraminal narrowing was not similarly "suggested" by the results of the 2011 MRI -- and does not indicate whether this was because the issue was no longer present or because the MRI simply captured a slightly different view. Notwithstanding the foregoing, the 2010 MRI specifically reflected that at L5-S1 there was "bilateral facet hypertrophy, *causing* mild neural foraminal narrowing" [AR at 189 (emphasis added)], and the 2011 MRI report found *"severe* bilateral facet hypertrophy" at L5-S1, which could reasonably be assumed to be a worsening of (and not an improvement in) plaintiff's condition at that level. [AR at 285.] Additionally, although the 2010 MRI found that at L2-L3 and L3-L4 there was no neural foraminal narrowing [AR at 189], the 2011 MRI showed "[i]ntervertebral disk space narrowing and disk dessication" from L2 to L4, i.e., the 2011 MRI clearly reflected that plaintiff's condition with respect to disc narrowing had not improved but instead had worsened.[11] [AR at 285.]

Finally, the ALJ's reliance on the September 13, 2010, opinion of the State agency reviewing consultant, Dr. Jacobs, with respect to medical improvement after July 31, 2010, is misplaced. Although the opinion of a non-examining physician "cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," Lester, 81 F.3d at 831, state agency physicians are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); Soc. Sec. Ruling ("SSR")[12]

---

[11] Although the 2011 MRI report notes that five sequences of the lumbar spine were performed, inexplicably only four were reflected in the findings; the report did not discuss the MRI findings at the L4-L5 level. [AR at 285.]

[12] "SSRs do not have the force of law. However, because they represent the Commissioner's
(continued...)

96-6p; Bray v. Astrue, 554 F.3d 1219, 1221, 1227 (9th Cir. 2009) (the ALJ properly relied "in large part on the DDS physician's assessment" in determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the claimant's functional limitations). Reports of non-examining medical experts "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). In this case, however, Dr. Jacobs only reviewed and/or relied on medical records relating to plaintiff's physical impairments dated August 20, 2009, September 1, 2009, December 22, 2009, May 8, 2010, and June 22, 2010 -- all of which were dated *prior to the date of the alleged medical improvement.* [AR at 230.] Most tellingly, Dr. Jacobs found plaintiff capable of light work based on his review of these records [AR at 231] -- again, all of which were generated *during the period the ALJ found plaintiff to be disabled.* The ALJ's reliance on Dr. Jacobs' opinion to determine plaintiff's medical improvement and RFC *after* July 31, 2010, was misplaced.

As defendant as not met her burden of showing that plaintiff experienced medical improvement that would allow her to engage in substantial gainful activity, remand is warranted on this issue.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits. Trevizo v. Berryhill, 871 F.3d 664, 682 (9th Cir. 2017) (citation omitted). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. Id. (citing Garrison, 759 F.3d at 1019). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the

---

[12](...continued)
interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

evidence were properly evaluated, remand is appropriate. See Garrison, 759 F.3d at 1021.

In this case, there are outstanding issues that must be resolved before a final determination can be made. In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, if the ALJ determines it is warranted, the ALJ shall order a consultative examination or examinations, with the appropriate physical and/or mental health specialist(s) first being provided with all of plaintiff's medical records to assess plaintiff's condition since August 1, 2010.[13] Second, because the ALJ's finding of medical improvement after July 31, 2010, was not supported by substantial evidence, the ALJ on remand shall reassess the medical opinion evidence of record with respect to plaintiff's impairments[14] and limitations after July 31, 2010, with the assistance of a medical expert if necessary, taking into account, if applicable, the new consultative examination(s), and all other medical evidence of record relevant to plaintiff's claim of disability after July 31, 2010. Third, the ALJ must explain the weight afforded to each opinion and provide legally adequate reasons for any portion of an opinion that the ALJ discounts or rejects, including a legally sufficient explanation for crediting one doctor's opinion over any of the others. Fourth, because the matter is being remanded for reassessment of plaintiff's impairments and limitations after July 31, 2010, the ALJ on remand, in accordance with SSR 16-3p,[15] shall

---

[13] Nothing in this decision is intended to disrupt the ALJ's finding that plaintiff was disabled from July 19, 2009, through at least July 31, 2010.

[14] Nothing in this decision is intended to disrupt the ALJ's finding that beginning August 1, 2010, plaintiff had at least the severe impairments of multilevel degenerative disc disease of the lumbar spine without spinal canal compromise; lumbar strain; lumbar radiculitis; obesity; depressive disorder; and anxiety disorder.

[15] On March 28, 2016, shortly after the ALJ's decision in this case, SSR 16-3p went into effect. See SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). SSR 16-3p supersedes SSR 96-7p, the previous policy governing the evaluation of subjective symptoms. Id. at *1. SSR 16-3p indicates that "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term." Id. Moreover, "[i]n doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character[;] [i]nstead, we will more closely follow our regulatory language regarding symptom evaluation." Id.; Trevizo, 871 F.3d at 678 n.5. Thus, the adjudicator "will not assess an individual's overall character or truthfulness in
(continued...)

reassess plaintiff's subjective allegations and either credit her testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any testimony.[16]  Fifth, based on his reevaluation of the entire medical record, and assessment of plaintiff's subjective symptom testimony, the ALJ shall determine plaintiff's RFC after July 31, 2010.  Finally, the ALJ shall determine at step five, with the assistance of a VE if necessary, whether plaintiff can perform any work existing in significant numbers in the regional and national economies.  See Shaibi v. Berryhill, 870 F.3d 874, 882-83 (9th Cir. 2017).[17]

## VII.

## CONCLUSION

   **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

   **IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

---

[15](...continued)
the manner typically used during an adversarial court litigation.  The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person."  2016 WL 1119029, at *10.  The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities." Id. at *2. The Ninth Circuit in Trevizo noted that SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expect to produce those symptoms,' and 'not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.'" Trevizo, 871 F.3d at 678 n.5 (citing SSR 16-3p).
   The ALJ's September 24, 2015, decision was before March 28, 2016, when SSR 16-3p became effective.  Notwithstanding the foregoing, SSR 16-3p shall apply on remand.

[16]   Because the ALJ will have to reevaluate plaintiff's subjective symptom testimony in light of his reassessment of plaintiff's impairments beginning August 1, 2010, the Court will not consider plaintiff's second issue herein.

[17]   Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to her past relevant work.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: May 23, 2018

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE